UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DAVID RUFFIN,

        Plaintiff,

v.

        Case Number 09-14664-BC
        Honorable Thomas L. Ludington

FRITO-LAY, INC.,

        Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE

On December 1, 2009, Plaintiff David Ruffin filed a three-count complaint against Defendant Frito-Lay, Inc., alleging that his employment was terminated because of his race in violation of the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101–.2804, and 42 U.S.C. § 1981. Plaintiff also contends that he was retaliated against by his employer for reporting the discrimination. Although Plaintiff did not identify a statutory basis for his retaliation claim, ELCRA and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, both prohibit employers from discriminating against employees for reporting race discrimination.

On November 24, 2010, Defendant filed a motion for summary judgment. Defendant contends that the § 1981 claim should be dismissed because the statute prohibits discrimination only in the making and enforcement of contracts, and Plaintiff was an at-will employee. Defendant further contends that the § 1981 and ELCRA discrimination claims should be dismissed because there is no evidence that similarly situated Caucasian employees were treated differently. Defendant similarly asserts that the retaliation claims should be dismissed because there is no causal connection between Plaintiff's complaints about race discrimination and the decision to suspend and then

terminate his employment. Finally, Defendant contends that even if Plaintiff could demonstrate a prima facie discrimination or retaliation claim, Defendant had a legitimate nondiscriminatory reason to suspend and then end Plaintiff's employment.

For the reasons explained below, Defendant's motion for summary judgment will be granted and Plaintiff's complaint will be dismissed with prejudice. There is no evidence that a similarly situated Caucasian employee was treated more favorably than Plaintiff or that his unsubstantiated reports of discrimination influenced Defendant's decision. Moreover, Plaintiff has not demonstrated that terminating his employment based on his dishonesty, poor job performance, and violations of the National Cash Policy was a pretext for race discrimination. As Plaintiff admits, Defendant exhaustively documented its extensive effort to work with Plaintiff and improve his performance.

**I**

Plaintiff went to work for Defendant in 1997, following his honorable discharge from the Navy. Pl.'s Dep. at 24. He first served as an "Extra Sales Representative," filling in for regular route drivers, selling, delivering, and stocking snack foods at retail stores. *Id.* at 25–28. After four-and-a-half years, Plaintiff was promoted, first to an up-and-down-the-street driver, then an express driver, and finally a "Route Sales Representative," or RSR, in approximately 2003. *Id.* at 28, 35, 37. RSRs have set routes servicing the same stores on a consistent basis. *Id.* at 37. RSRs are responsible for selling Frito Lay products and stocking the products in retail stores in accordance with the company's merchandising guidelines. *Id.* at 37–38.

Defendant's RSR employee handbook, which Plaintiff acknowledged in writing on June 15, 2006, provided a formal "Corrective Action Process" for dealing with "performance deficiencies." [Dkt. # 26-D]. For "first-time" problems, the policy provided for informal discussions between the

employee and his or her supervisor. After that, it provided for four documented steps of discipline:

> **Step 1** *Written Reminder* – Written Reminder is the first step of formal corrective action to address unsatisfactory job performance or conduct issues. Expectations for improvement are outlined in the document, and failure to correct performance or conduct will result in further corrective action. The Written Reminder remains active for nine (9) months.
>
> **Step 2** *Written Warning* – Written Warning is the second step of formal corrective action to address continuing performance or conduct issues. Expectations for improvement are outlined in the document, and failure to correct performance or conduct will result in further corrective action. The Written Warning remains active for nine (9) months.
>
> **Step 3** *Final Warning* – Final Warning is the final step of formal corrective action prior to termination. Expectations for improvement will be outlined in the document, and failure to correct performance or conduct will result in termination of employment. The Final Warning remains active for nine (9) months.
>
> **Step 4** *Termination* – In general, performance or conduct issues that occur while the employee is on a Final Warning, will result in termination.

In 1997, Plaintiff received a documented verbal warning from his supervisor for not rotating stock properly and leaving stale bags of Doritos on the shelves. Pl's Dep. at 48–49. On January 6, 2003, Plaintiff received another documented verbal warning from his supervisor, Marlane Fenlon, counseling him regarding stale snacks on the shelf and the importance of reaching sales goals. *Id.* at 51–52. Plaintiff contends that Fenlon issued the warning at least in part because of his race. *Id.* at 52–53. He does not dispute whether there were stale snacks on the shelves or whether he was reaching his sales goals, but contends that none of his Caucasian co-workers were receiving the same level of supervision. *Id.* He did not know, however, whether any of his co-workers received verbal or written counseling. *Id.*

On March 27, 2003, Plaintiff received a documented verbal warning from Fenlon because he called in sick at 6:00 a.m. and he should have called in sick before 5:30 a.m. [Dkt. # 26-E].

Additionally, Fenlon noted that she performed Plaintiff's job duties on that date, and that she observed insufficient stock at one of the stores, including a lack of "dash for cash" items. Pl.'s Dep. at 73–74. Plaintiff testified that the March 27, 2003 warning was discriminatory because it showed that Fenlon was scrutinizing him in a way that she was not scrutinizing other employees and she was trying to "impose a start time" on him. *Id.*

On January 29, 2004, Plaintiff received a written warning from Fenlon after the manager of the largest account on his route, Pinny Foods, called and asked that a different RSR service the store. *Id.* at 81–82; [Dkt. # 26-F]. The manager was concerned about Plaintiff's ability to communicate with store personnel, particularly with regard to specials and new products. Plaintiff was suspended from his route from January 26, the day of the complaint, through January 29, but he was permitted to return to the route after the Pinny Foods manager agreed to work with Plaintiff to solve problems at the store. Plaintiff does not believe the warning was discriminatory.

On June 14, 2004, Plaintiff received a final warning, after one of the stores on his route called to complain that their rack was empty and Fenlon discovered that Plaintiff had not serviced the store in three weeks. Pl.'s Dep. at 88–89; [Dkt. # 26-G]. Plaintiff admitted that he was required to service the store on a weekly or bi-weekly basis and that he did not meet that requirement. He further testified that he believed he was receiving extra scrutiny from Fenlon because of his race, but he did know whether other drivers had received customer complaints similar to the complaints that led to Plaintiff's written warning and final warning. Pl.'s Dep. 93.

After he received the final warning, Plaintiff filed a complaint with the Michigan Department of Civil Rights ("MDCR") and the Equal Employment Opportunity Commission ("EEOC"), alleging that he had been discriminated against because of his race. *Id.* at 52–60. After mediation, Plaintiff

and Defendant agreed to settle the complaint by changing the June 14 final warning to a Step One Written Reminder, which would be effective through June 14, 2005. [Dkt. # 30-3].

On May 13, 2005, one month before the Step One Written Reminder was scheduled to expire, the manager of a Speedway in Kawkawlin, Michigan informed Defendant that Plaintiff "continuously hits on" one of the clerks in the store. *Id.* at 94–96; [Dkt. # 26-H]. Nick Dujmovich, a Frito Lay manager, investigated the situation and determined that there had been "mutual flirting" between Plaintiff and the clerk, Teri Manyen. He further determined, however, that engaging in "mutual flirting" with store employees was inconsistent with the company code of conduct and issued a Step Two Written Warning on May 18, 2005. Plaintiff admits that he may have flirted with Manyen, but contends that he never harassed her. Pl.'s Dep. at 97–101. Plaintiff testified that he told Manyen she was "looking good" after a pregnancy and that he discussed her boyfriend with her, but that he never "asked her out." *Id.* at 103–04. He contends that the warning was issued because he filed the MDCR complaint and the Step One Written Reminder was about to expire. Plaintiff testified that he signed an acknowledgment of the written warning only after Dujmovich threatened to terminate his employment. Plaintiff did not believe his conduct violated Frito Lay policy. *Id.* at 105–07. Manyen also provided Plaintiff with a signed letter indicating Plaintiff never harassed her. [Dkt. # 30-9].

Shortly before, or perhaps after, the May incident, Plaintiff filed a second complaint with the MDCR. Pl.'s Dep. 108–09, 115-18. It is unclear from the parties papers the date that the complaint was filed. The complaint was dismissed due "insufficient evidence" on October 12, 2005. [Dkt. # 26-I]. Plaintiff believed the May 18 Step Two Written Warning was motivated by one or both of his MDCR complaints. Pl.'s Dep. at 110.

Ultimately, the May 18, 2005 Step Two Written Warning expired, and Defendant did not identify any further problems with Plaintiff's performance during the rest of 2005 or 2006. Then, on January 8, 2007, Plaintiff's new supervisor, Scott Campbell, issued a Step One Written Reminder to Plaintiff after he encountered stale products on the shelves at two of Plaintiff's accounts. *Id.* at 119–20; [Dkt. # 26-L]. Plaintiff acknowledges that there were stale products on the shelf, that the Written Reminder was accurate, and that Campbell's decision to issue it was not discriminatory.

On February 25, 2008, Plaintiff received another Step One Written Reminder, emphasizing the "poor condition" of his accounts and encouraging him to remove stale products from his stores, provide proper inventory to the stores, and follow Frito Lay's merchandising requirements. Pl.'s Dep at 122–24; [Dkt. # 26-M]. Plaintiff does not dispute that the Written Reminder accurately depicted the conditions in the stores, but he contends that issuing the Written Reminder was discriminatory because Plaintiff had recently been on vacation and the drivers who worked the stores while he was gone were not disciplined. Pl.'s Dep. at 125–26. Plaintiff admitted, however, that he had been back to work for two days before his supervisors visited the stores, and he was the most recent RSR to service all of the stores. *Id.* at 126–27.

On July 8, 2008, Plaintiff received a Step Two Written Warning from Shelley McConnell, noting the poor condition of Plaintiffs accounts, particularly the lack of products on the shelves and the existence of stale products in the stores. *Id.* at 130–37; [Dkt. # 26-N]. Plaintiff contends that the warning was "created" by McConnell, and that she had a history of discriminating against him based on his race. In 2001, Plaintiff believed that McConnell threatened him, saying "you're route better be perfect." Pl.'s Dep. at 133. Plaintiff also believed McConnell treated Caucasian employees more favorably than Plaintiff, including Jenifer Neilen, whom he believed was not

-6-

disciplined for accumulating $925 in stale products in one week. *Id.* at 134–35. Plaintiff also believed that McConnell did not actually visit the stores, because it was not believable that she would have driven forty-five minutes from Saginaw to Pinconning to inspect the stores. *Id.* at 137–38. Plaintiff did not, however, ask the store managers whether McConnell had visited the stores and he did not know whether the conditions she reported were accurate. *Id.* at 139–41.

On March 17, 2009, Plaintiff received a Step Three Final Warning for violating Frito Lay's National Cash Policy. *Id.* at 144. Plaintiff admits he violated the National Cash Policy—indeed, he admits he did not even know what the National Cash Policy was because he did not "pay that much attention to it"—but contends that issuing the Step Three Final Warning was excessive and motivated by his race. *Id.* at 145–47, 149–50. The National Cash Policy required RSRs to collect payments for the products they delivered on a daily basis and to turn in those payments at the end of each day. On February 12, 16, 23, and 26, 2009, Plaintiff collected the payments for the products that he delivered to the stores, but he did not turn the payments in at the end of the day. *Id.* at 150–52. On some of those days, he testified that he may have lost the checks and been looking for them, on other days, he suggested that Frito Lay managers may have taken the checks in a deliberate effort to make it appear that Plaintiff turned the money in late. *Id.* He did not, however, dispute Defendant's assertion that the payments were turned in late on those dates. *Id.* at 153.[1]

On March 18, 2009, Plaintiff submitted a formal complaint, pursuant to the RSR Handbook [Dkt. # 26-D], contending that the Step Three Final Warning resulted directly from his informal

---

[1] Plaintiff also testified that he believed the Step Three Final Warning was motivated by his January 20, 2009 telephone complaint to a human resources representative. During the telephone call, Plaintiff informed human resources that the earlier disciplinary measures were motivated by his race. Pl.'s Dep. at 172–75.

verbal complaints to human resources following the Step One and Step Two warnings. [Dkt. # 30-4]. Plaintiff further alleged in the complaint that each of the documented warnings were issued because of his race and because of his complaints about race discrimination, in violation of Frito Lay policy and federal and state law. Plaintiff asserted that the information contained in the Step Three Final Warning was "untrue and I have never been late with money."

Defendant investigated Plaintiff's allegations, meeting with Plaintiff on three occasions, and determined that his allegations of race discrimination and retaliation were unfounded. *Id.* at 180–83. Plaintiff filed a Level Two Complaint on April 9, 2009, asking the company to revisit its decision. *Id.* at 184; [Dkt. # 30-4]. When he was confronted about the accuracy of the statement by one of his supervisors, Plaintiff reaffirmed his contention that he had "never been late with money." *Id.* at 185–87.

On April 24, 2009, Plaintiff was suspended for three days while the company investigated whether he had been dishonest in contending that he had "never been late with money." *Id.* at 188–89. A manager, Kelli Donnelly-McCargar, performed Plaintiff's work duties during the suspension and observed numerous problems at the stores on Plaintiff's route, including a lack of product, stale product, and noncompliance with Frito Lay merchandising guidelines. [Dkt. # 26-B]. On April 29, 2009, Plaintiff's employment was terminated for misrepresenting facts in his Level One Complaint and the poor job performance documented by Donnelly-McCargar. *Id.* According to the RSR handbook, misrepresenting facts can subject an employee to immediate termination. *Id.*; [Dkt. # 26-D]. Plaintiff admits that he misrepresented facts about his compliance with the National Cash Policy in his Level One Complaint. Pl.'s Dep at 192. He testified that he "might have worded it differently, wrong, out of anger." *Id.*

**II**

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). If the opposing party does not raise a genuine issue of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Id.* at 250.

The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

**III**

Plaintiff contends that Defendant would not have suspended and then terminated his

employment but for the fact that he complained internally, and to the MDCR, about race discrimination. 42 U.S.C. § 2000e-3(a); Mich. Comp. Laws § 37.2701(a).[2] Because Plaintiff does not have any direct evidence of retaliation, he must proceed pursuant to the *McDonnell Douglas Corp. v. Green* paradigm. 411 U.S. 792, 802–03 (1973). To establish a prima facie case of retaliation under ELCRA and Title VII, Plaintiff must demonstrate that he engaged in a protected activity, his employer knew of the activity, the employer subsequently took a materially adverse action toward the plaintiff, and that there is a "causal connection" between the protected activity and the adverse employment action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *Booker*, 879 F.2d at 1310–11. To demonstrate a causal connection, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination [claim]." *Nguyen*, 229 F.3d at 563 (citation omitted). "Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Id.*

Defendant contends that the proximity in time between Plaintiff's Level One Complaint alleging race discrimination on March 18, 2010, and Plaintiff's Step Four Termination six weeks later is insufficient to establish a causal connection. Plaintiff responds that the pattern of retaliation, beginning with the 2004 MDCR complaint, demonstrates a sufficient causal connection to create

---

[2] The retaliation components of ELCRA and Title VII are remarkably similar and "should be construed in the same manner." *Booker v. Brown & Williamson Tobacco, Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989). Neither party has identified a material difference between the statutes in this case. Accordingly, the claims will be considered together.

-10-

a fact issue for the jury. *See Danielson v. City of Lorrain*, 938 F.2d 681, 683–85 (6th Cir. 1981) (dismissing the plaintiff's contention that her employer created a false paper trail to hide its true reason for terminating her employment). Plaintiff emphasizes that the decision to terminate his employment was made after Plaintiff filed his Level One Complaint, and that the decision was motivated, in part, by false statements of fact that were contained in the Level One Complaint.

The short period of time that passed between Plaintiff's formal complaint and the decision to end his employment may be some evidence of a causal connection. Indeed, Defendant explained its decision to terminate Plaintiff's employment, at least in part, based on false allegations contained in that formal complaint. When the context surrounding those events is considered, however, the record demonstrates that the decision was not a knee-jerk reaction to Plaintiff's discrimination complaint, but a long and well considered effort to improve an employee with a history of performance problems. When, after considerable effort, the performance did not improve, the employee was replaced.

Notably, Plaintiff has not identified a single similarly situated employee who was treated differently, nor has he challenged the factual basis for the decision. Plaintiff admits that his accounts were in poor condition and that he included false information in his formal complaint concerning race discrimination. He has not produced sufficient evidence for a reasonable jury to infer that but for Plaintiff's complaints of race discrimination, his employment would not have been terminated.

**IV**

To demonstrate a prima facie case of employment discrimination under § 1981 and ELCRA, Plaintiff must show that he is a member of a protected class, he was subject to an adverse employment action, he was qualified for his position, and a comparable person outside of his class

was treated more favorably. *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002). To be "similarly situated," Plaintiff must demonstrate that "all relevant aspects of his employment situation are 'nearly identical' to those of the [Caucasian] employees who he alleges were treated more favorably." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994) (citations omitted). The criteria relevant to the determination "depend[] upon the facts and circumstances of each individual case." *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005).

Plaintiff contends that Caucasian RSRs and Extra Sales Representatives were treated more favorably than him. He only identifies one by name, however, and he does not compare his responsibilities with those of his co-workers, compare his performance with that of his co-workers, or present evidence that demonstrates Caucasian RSRs and Extra Sales Representatives were not disciplined for violating company policy or poor job performance. Rather, he contends that his performance was scrutinized more closely by supervisors than the performance of his Caucasian peers and that the Extra Sales Representatives who handled Plaintiff's route while he was on sick leave or vacation are responsible for the performance deficiencies cited by his managers.

Plaintiff has not provided sufficient evidence that similarly situated Caucasian employees were treated differently to raise a genuine issue of material fact for trial. While extra scrutiny may be sufficient to demonstrate discrimination, Plaintiff has not produced any actual evidence that he received extra scrutiny other than his own suspicions. Plaintiff frequently suggested during his deposition that Caucasian employees were treated more favorably than him, but he offered few specifics. For example, he testified that he spoke with other RSRs who did not receive written warnings, but admitted he did not know whether the condition of their accounts was similar to his, making the comparison unpersuasive. He also testified that the Extra Sales Representatives who

serviced his route when he was on vacation did not receive written reminders or warnings, even though he asserted they shared responsibility for the condition of his accounts. This comparison is also unavailing, however, because Extra Sales Representatives have different duties than RSRs and RSRs, as Plaintiff admits, are ultimately responsible for the condition of their assigned stores at all times. [Dkt. # 30-15].

**V**

Even if Plaintiff were able to demonstrate a prima facie case of retaliation or discrimination, Plaintiff cannot demonstrate that Defendant's asserted reasons for utilizing the progressive discipline policy and ultimately terminating his employment were pretextual. *See McDonnell Douglas*, 411 U.S. at 802–05; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). Plaintiff has offered no evidence that Defendant's explanations for the progressive discipline and termination lacked a basis in fact, were not the actual reasons for the decisions, or were insufficient to warrant progressive discipline and ultimately termination. *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007).

Plaintiff admits that each of Defendant's explanations for imposing corrective action included factually accurate information and that the RSR handbook informed employees that repeated violations of company policy would lead to termination. He contends, however, that Defendant's stated reasons for its decisions were not the real reasons.

Plaintiff emphasizes that he was not at risk of termination until he filed the formal race discrimination complaint in March 2009. Still, he does not explain why his inclusion of false information in that complaint should be excused. This is not a case where Defendant's concerns about Plaintiff's policy violations arose after he made the formal complaint. *DeBoer v. Musahi Auto*

*Parts, Inc.*, 124 F. App'x 387, 393–94 (6th Cir. 2005). Defendant consistently counseled Plaintiff about his performance and the need to conform to company guidelines for more than ten years. Nor did Defendant ever disregard the disciplinary policies and procedures outlined in its handbook. *Id.* Plaintiff received a Step Three Final Warning due to poor performance, and immediately filed a claim for race discrimination. When the company determined that he had lied on the complaint form and that his performance had not improved, he received a Step Four Termination. Finally, there is no evidence that Defendant manufactured a "paper trail" to provide cover for a retaliatory termination. *Danielson*, 938 F.2d at 683. Defendant documented Plaintiff's policy violations and performance deficiencies as they arose, and there is no evidence that employees who engaged in similar conduct were treated differently.

## VI

To prevail, Plaintiff would have to convince a jury by a preponderance of the evidence that his employment was terminated because of his race or in retaliation for reporting race discrimination. *See Burdine*, 450 U.S. 248. Plaintiff has not advanced sufficient evidence to identify a legitimate question of fact.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [Dkt. # 26] is **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the hearing scheduled for February 8, 2011 was **CANCELED** based on the Court's determination that it would not aid in the resolution of Defendant's motion. E.D. Mich. L.R. 7.1(f)(2).

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: February 16, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 16, 2011.

s/Tracy A. Jacobs
TRACY A. JACOBS

---